337 A.2d 873
**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**LeRoy STOLTZFUS, Appellant.**

Supreme Court of Pennsylvania.

Argued April 25, 1974.

Decided May 13, 1975.

44

46

48

James M. Potter, Reading, for appellant.

Grant E. Wesner, Deputy Dist. Atty. for Law, Reading, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

EAGEN, Justice.

The appellant, LeRoy Stoltzfus, was found guilty by a jury of murder in the first degree. Post trial motions were denied and a sentence of life imprisonment was imposed. This direct appeal followed.

The prosecution stemmed from the untimely death of Marilyn H. Sheckler, eighteen years of age in Berks Courty. She was last seen alive, in an automobile in the company of her boy friend, Glenn W. Eckert, at 9:30 p. m. on August 12, 1969. On August 19, 1969, the automobile which Eckert had been driving was found abandoned in Leesport, Pennsylvania. Found in the automobile were several articles of clothing identified as belonging to Miss Sheckler and Eckert. On October 24, 1969, while making a search in a wooded area in Berks County, State Police officers discovered under some rocks near a stone wall, a decomposed body partially clad in a yellow dress. The body was later identified as Miss Sheckler.[1]

1. The skull was identified as being that of Miss Sheckler by her dentist, Dr. Ross Miller, through comparison of his dental charts.

At trial, the Commonwealth's case against Stoltzfus rested primarily on the testimony of James Eways and Harlin Bailey, which may be summarized as follows:

At approximately 1:00 a. m., on August 13, 1969, Stoltzfus, Eways, Bailey and Robert Martinolich, pursuant to a plan to kidnap a girl for the purpose of satisfying each of the group member's sexual whims, drove to Skyline Drive, located on the top of a mountain overlooking Reading, Pennsylvania. After driving around for a short time, they stopped alongside a parked vehicle occupied by Eckert and Miss Sheckler. Stoltzfus, Bailey and Martinolich entered the parked vehicle, and took the young couple captive. They then proceeded to follow Eways, who was driving a panel truck, to Leesport where the Eckert vehicle was abandoned. Miss Sheckler was forced to undress in the rear of the panel truck where a variety of sexual abuses were performed upon her by Stoltzfus and his companions. Subsequently, the four proceeded with their captives to Dreamland Park where their "clubhouse" was located. However, on approaching it, they discovered two police vehicles parked across its entrance. Stoltzfus, Bailey and Martinolich, along with the two captives, then exited from the panel truck and entered the woods wherein Miss Sheckler's body was eventually discovered. Eways then drove away in the panel truck and, shortly thereafter, Bailey left the woods in order to find transportation for the group.

In addition to the foregoing, Bailey testified to three conversations he had with Stoltzfus following their arrest. In one, Bailey asked Stoltzfus what happened to the boy and girl [Eckert and Miss Sheckler], and the latter replied, "Don't worry about it, we took care of them, just forget you ever saw them." In the other two conversations, Stoltzfus explained that he attempted to choke Miss Sheckler and when she wouldn't die he crushed her skull with a rock and buried the body underneath rocks obtained from a nearby stone fence.

Stoltzfus was indicted for the murder of Miss Sheckler, and Martinolich was indicted for the murder of Eckert, whose body was discovered on October 23, 1969. Upon Stoltzfus' motion he was granted a separate trial. Martinolich was tried first and was convicted in June 1970 of murder in the first degree.[2] Stoltzfus was tried in September 1970 and found guilty of murder in the first degree.

A number of trial errors are asserted on this appeal. We find none meritorious and will, therefore, affirm the judgment. These claims of error will be discussed seriatim.

Initially, it is urged the trial court erred in refusing to grant pretrial motions for a change of venue.[3] Stoltzfus contends substantial adverse publicity at the time of the slayings and during the Martinolich trial denied him a fair trial by an impartial jury.

The grant or refusal of a change of venue is within the sound discretion of the trial court. *Commonwealth v. Powell,* 459 Pa. 253, 261, 328 A.2d 507, 510 (1974) ; *Commonwealth v. Martinolich,* supra, 456 Pa. at 141, 318 A.2d at 683; *Commonwealth v. Hoss,* 445 Pa. 98, 107, 283 A.2d 58 (1971). On appeal from the refusal of the trial court to grant a change of venue, the test is whether the court abused its discretion or committed an error of law which controlled the outcome of the case. *Commonwealth v. Swanson,* 432 Pa. 293, 248 A.2d 12 (1968).

2. On March 25, 1974, this Court affirmed the judgment of sentence. See *Commonwealth v. Martinolich,* 456 Pa. 136, 318 A.2d 680 (1974), cert. denied, 419 U.S. 1065, 95 S.Ct. 651, 42 L.Ed.2d 661 (1974).

3. Stoltzfus filed two petitions for a change of venue. The first, in conjunction with a similar petition filed by Martinolich, was denied, after an evidentiary hearing, on March 3, 1970, at which time a continuance was granted to permit counsel additional time for preparation. The request was renewed subsequent to Martinolich's conviction and, after another evidentiary hearing, denied on July 14, 1970.

■ Although there was extensive media coverage of the crimes at the time the bodies of the victims were found, and also during the Martinolich trial, by the time Stoltzfus' trial commenced, the effect of any damaging publicity had subsided, and the selection of the jury was not adversely affected. Stoltzfus' trial was more than a year after the crimes occurred and three months after Martinolich's trial. Under the circumstances, "there was time for the effect of these news stories to fade from the minds of prospective jurors." *Commonwealth v. Powell,* supra. See also *Commonwealth v. Hoss,* supra. Moreover, the reporting was factual in nature and not particularly inflammatory. As noted by this Court in *Commonwealth v. Martinolich,* supra 456 Pa. at 142, 318 A.2d at 684:

> "Defense counsel at the March, 1970 hearing offered several newspaper accounts as proof of overwhelming community prejudice against appellant. However, many of these articles describe only the unrelated incident of the August 12 beating of the three young men, and others speak of the unexplained disappearance of Eckert and [Miss] Sheckler. It is true that a few newspaper stories are written in the graphic style endemic to journalism, but their total number is small. *Most of the newspaper articles in the record are simply straightforward accounts of the police investigation, judicial proceedings, and other matters in the public record.* [Emphasis supplied.]

Similar reasoning is applicable instantly.[4]

In addition, the trial court determined that it was possible to select jurors who had no fixed opinion as to Stoltzfus' guilt. *Commonwealth v. Powell,* supra; *Commonwealth v. Hoss,* supra. The record justifies this con-

---

4. Stoltzfus contends that he was further prejudiced by the news coverage given the Martinolich trial. Our review of the news coverage during the Martinolich trial, fails to disclose any news articles which were inflammatory or of the nature that would incite prejudice against Stoltzfus at his trial three months later.

clusion. Of the one hundred and thirty-nine prospective jurors questioned on voir dire, only thirty-one indicated they had formed an opinion as to the guilt or innocence of Stoltzfus and only one of these thirty-one served on the trial jury. This juror stated affirmatively that he could set aside his opinion and render a decision based solely on the evidence presented at trial.[5] The other eleven jurors and two alternates selected stated they had no opinion as to the guilt or innocence of Stoltzfus.

The trial court denied the motions for a change of venue because it was satisfied Stoltzfus could receive a fair trial in Berks County. Upon this record, we find no abuse of discretion or error of law in this determination. Cf. *Commonwealth v. Powell*, supra.

Stoltzfus next contends the trial court committed reversible error in refusing, after timely motion, to exclude jurors already selected, from the court room during the examination of other prospective jurors. He asserts this refusal subjected those jurors already selected to "prejudicial discussion and answers by panel members being questioned". We find no merit to this argument.

■ Rule 1106 of the Pennsylvania Rules of Criminal Procedure, 19 P.S. Appendix, provides:

"(b) The voir dire of prospective jurors shall be conducted individually and *may* be conducted beyond the hearing and presence of other jurors." [Emphasis supplied.]

Clearly the exclusion from the court room of selected jurors during the continuing voir dire examination is not mandatory. While exclusion may be the "more desirable practice", such determination is a trial matter, committed to the sound discretion of the trial court. *Common-*

5. This juror was, in fact, the first juror selected to serve, Stoltzfus then having exercised only two peremptory challenges.

*wealth v. Martinolich,* supra, 456 Pa. at 146, 318 A.2d at 686. The trial court explained the situation in this manner:

"[A]s a practical matter, there was neither space nor supervisory personnel available to keep accepted jurors separate from the court room. The use of a jury deliberation room of twelve by fifteen feet for such purpose was not feasible. Considering it took nine court days to select the jury, to compel one to thirteen jurors to be confined to a room of such size for a varying number of days up to nine court days would have resulted in an exhausted and frustrated jury before the trial even began, which of itself would have been prejudicial to the defendant."

Similar reasoning was recently approved by this Court in *Commonwealth v. Martinolich,* supra at 145–146, 318 A. 2d at 686.

■■ Stoltzfus fails to point to any prejudicial event or incident which conceivably may have influenced the jurors selected to serve during the trial. Moreover, immediately after the entire jury was agreed upon, it was reminded to decide the case solely on the basis of the evidence presented at trial, without regard for any preconceived notions or opinions. We will not presume that the jurors disregarded their duty and the instructions of the Court. Cf. *Commonwealth v. Martinolich,* supra.

It is next asserted the trial court erred in permitting the Commonwealth to establish the corpus delicti through the testimony of Dr. George P. Desjardins. Dr. Desjardins, who performed the autopsy upon Miss Sheckler's remains, testified: "My opinion is that this young lady died as a result of a blow to the left side of the head producing a depressed skull fracture." It is argued that, because Dr. Desjardins failed to state his opinion in terms of "beyond a reasonable doubt", the testimony was insufficient to establish the required causal connection between the death and the criminal act.

This argument is premised on the fact that Miss Sheckler's body was not discovered until October 24, 1969, at which time many of the vital organs had deteriorated and were, therefore, unavailable for the autopsy. Stoltzfus claims Dr. Desjardins could not definitely rule out a possible cause of death connected with those vital organs not available for examination. Additionally, it is pointed out that the witness, on cross-examination stated the depressed skull fracture "probably" was the cause of death.

■■ It is well established that an individual may not be convicted of murder unless the Commonwealth establishes every essential element of the crime beyond a reasonable doubt. *Commonwealth v. Webb,* 449 Pa. 490, 494, 296 A.2d 734 (1972); *Commonwealth v. Radford,* 428 Pa. 279, 281, 236 A.2d 802 (1968). Cf. *Commonwealth v. Rose,* 457 Pa. 380, 321 A.2d 880 (1974). One such required element is the causal connection between the death and the criminal act. *Commonwealth v. Webb,* supra; *Commonwealth v. Embry,* 441 Pa. 183, 185, 272 A.2d 178 (1971). However, to permit evidence of a medical opinion as to cause of death to be considered by the trier of fact, it is only necessary that the witness entertain a "reasonable degree of medical certainty" for his conclusions. *Commonwealth v. Webb,* supra at 495, 296 A.2d at 737. As we stated in *Commonwealth v. Webb,* supra, 449 Pa. at 496, 296 A.2d at 737:

> " 'Beyond a reasonable doubt' is a legal standard. Medical causation and legal causation are qualitatively different in their application. [cite omitted] Whether the Commonwealth's evidence is sufficient to warrant a finding of causal connection is initially a legal question for the court, but whether it is persuasive beyond a reasonable doubt is for the jury to say."

■ Instantly, Dr. Desjardins was able to rule out every other possibility as to the cause of death. Although,

in response to defense counsel's carefully worded questions incorporating the word "probably" as to the cause of death, Dr. Desjardins did reply in the affirmative, Dr. Desjardins never himself used the word "probably" in his testimony. Rather, he testified emphatically and without qualification that it was his professional opinion that death was caused by a blow to the left side of the skull with a hard object.[6] This was sufficient to meet the Commonwealth's burden of proof as to causal connection and Dr. Desjardins' testimony was properly admitted.

It is next contended that testimony of Bailey as to statements by Martinolich and Stoltzfus implicating Stoltzfus should have been stricken because the corpus delicti had not first been established.[7] It is unquestioned that an extrajudicial admission or confession of one accused of a crime may not be introduced into evidence unless the corpus delicti of the crime has been established by independent proof. *Commonwealth v. Ware,* 459 Pa. 334, 365, 329 A.2d 258, 274 (1974); *Commonwealth v. Leamer,* 449 Pa. 76, 83, 295 A.2d 272

---

**6.** Dr. Desjardins responded to questioning by the trial judge as follows:

"Q. Doctor, I am still concerned as to your opinion. Would it be a fair statement, from what you said, that although you could rule out every other possibility, that your professional opinion is that death was caused as a result of a blow to the left side of the skull with a hard object causing a skull fracture on the left side of the head . . . and a contrecoup fracture of the right temple bone?

"A. That is right.

"Q. Is that your professional opinion?

"A. This is my professional opinion."

**7.** Appellant, citing *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), now contends it was fundamental error to permit Bailey to testify as to Martinolich's statements because Martinolich was not available for cross-examination. The record reveals that the appellant failed to raise this objection at any time during the course of the trial. Therefore, this issue has not properly been preserved for appellate review. *Commonwealth v. Clair,* 458 Pa. 418, 326 A.2d 272 (1974); *Commonwealth v. Agie,* 449 Pa. 187, 296 A.2d 741 (1972).

(1972); *Commonwealth v. Puglise,* 276 Pa. 235, 238, 120 A. 401 (1923). Prior to the introduction of Bailey's testimony, the Commonwealth had established the fact of Miss Sheckler's death and, through the testimony of Dr. Desjardins, the fact that the death occurred under circumstances indicating it was criminally caused. The corpus delicti having been properly and sufficiently established, Stoltzfus' own statements and admissions were properly received as evidence against him, as were the statements of Martinolich. Cf. *Commonwealth v. Turza,* 340 Pa. 128, 16 A.2d 401 (1940).[8]

 In addition the trial court permitted Eways and Bailey to relate statements of Martinolich made while the group was cruising around in the panel truck, immediately prior to their taking Eckert and Miss Sheckler captive. Stoltzfus contends this was error because Martinolich was not on trial, there was no conspiracy charged and no conspiracy existed at the time Martinolich made the statements. We disagree.

The challenged evidence was conversation between co-conspirators during the conspiracy, which is an exception to the hearsay rule and admissible. *Commonwealth v. Holloway,* 429 Pa. 344, 346, 240 A.2d 532 (1968); *Commonwealth v. Ellsworth,* 409 Pa. 505, 509–510, 187 A.2d 640 (1963). The Commonwealth's evidence at trial clearly shows that, at the time of Martinolich's statements, Stoltzfus was present and the group was acting in

8. Bailey related a conversation with Stoltzfus during which Stoltzfus, after stating how he had covered Miss Sheckler's body with stones from a nearby fence, indicated, "They might find the boy's [Eckert's] grave, but they would not find the girl's grave." Defense counsel immediately moved to strike this testimony and asked for a mistrial. The trial court, although overruling the motion for a mistrial, did instruct the jury to disregard the reference to "the boy's grave". We believe the court acted properly. It is settled that remedial instructions to a jury may rectify some prior prejudicial error. *Commonwealth v. Murray,* 437 Pa. 326, 331, 263 A.2d 886 (1970). Whatever harm the testimony may have caused Stoltzfus was sufficiently mitigated by the court's action.

concert. Moreover, the co-conspirator whose declaration is testified to need not be on trial, nor must a conspiracy be charged. *Commonwealth v. Garrison,* 398 Pa. 47, 51, 157 A.2d 75 (1959).

Next, it is contended the district attorney exceeded the bounds of proper cross-examination of Stoltzfus, thus abrogating his right to a fair and impartial trial. Stoltzfus took the stand in his own defense at trial. On direct examination, he denied having killed Miss Sheckler. He testified that he had been walking through the woods near Dreamland Park on the night in question, seeking to avoid the police for an unrelated incident, when he came across Bailey and Eways holding a young couple captive. He further testified that, while Eways held a knife to his [Stoltzfus'] throat, Bailey knocked the young woman to the ground and beat her until she was dead. When asked by his counsel whether the police had ever questioned him about this incident, Stoltzfus replied, "No".

During cross-examination of Stoltzfus, the following questions and answers took place:

"Q. Isn't it more correct, Mr. Stoltzfus, to say that you refused to give a statement to the police when they asked—when they wanted to question you?

"A. I was never questioned about that.

"Q. Were you questioned on August, either the evening of August 13 or the morning of August 14, 1969?

"A. Yes."

Appellant contends this cross-examination was in violation of his Fifth Amendment right to refuse to make a statement in that it attempted to create an impermissible inference that his silence, when questioned by the police, could be taken as an expression of guilt. However, the record discloses that this cross-examination was not objected to at trial for the reason now asserted. Rather, the only objection at trial to this cross-examina-

tion was that the district attorney was questioning Stoltzfus about other offenses. It has long been the rule in this jurisdiction that if the ground upon which an objection is based is specifically stated, all other reasons for its exclusion are waived, and may not be raised post trial. *Commonwealth v. McNeal,* 456 Pa. 394, 398, 319 A.2d 669 (1974); *Commonwealth v. Budd,* 443 Pa. 193, 195, 278 A.2d 879 (1971); *Commonwealth v. Raymond,* 412 Pa. 194, 202–203, 194 A.2d 150 (1963).

Furthermore, while it is fundamental that the prosecution "may not introduce evidence of the defendant's prior criminal conduct as substantive evidence of his guilt of the present charge", *Commonwealth v. Clark,* 453 Pa. 449, 452, 309 A.2d 589, 590 (1973); *Commonwealth v. Allen,* 448 Pa. 177, 181, 292 A.2d 373 (1972), the cross-examination complained of did not either expressly or by reasonable implication convey the fact of a prior criminal offense unrelated to the criminal episode for which Stoltzfus was then on trial. Cf. *Commonwealth v. Banks,* 454 Pa. 401, 311 A.2d 576 (1973). Therefore, this cross-examination was properly permitted.[9]

Stoltzfus next argues that certain statements of the district attorney during his closing argument to the jury violated the rules of proper professional conduct and deprived him of a fair trial. The district attorney, in commenting upon Stoltzfus' story, stated: "[I]f it weren't for the tragedy of the situation, I would sometimes picture a Keystone Cop's testimony" and "If it weren't for the tragedy of this case, those lines would be some of the funniest lines in the court room, because they are utterly unbelievable." Admittedly, these com-

---

9. Stoltzfus further contends that certain "theatrics" engaged in by the district attorney during this cross-examination operated to deny him a fair and impartial trial. Our review of the record convinces us that the conduct was not of a nature so as to require a new trial.

ments were improper and should not have been uttered by the district attorney. See ABA Project on Standards for Criminal Justice Relating to the Prosecution and Defense Function, Section 5.8(b) (Prosecution Function) (Approved Draft 1970).[10] See also *Commonwealth v. Potter*, 445 Pa. 284, 285 A.2d 492 (1971). But even where the language of the district attorney is intemperate, uncalled for and improper, a new trial is not necessarily required. *Commonwealth v. Crittenton*, 326 Pa. 25, 31, 191 A. 358 (1937); *Commonwealth v. McHugh*, 187 Pa.Super. 568, 577, 145 A.2d 896 (1958). The language must be such that its "unavoidable effect would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant, so that they could not weigh the evidence and render a true verdict." *Commonwealth v. Simon*, 432 Pa. 386, 394, 248 A.2d 289, 292 (1968). See also *Commonwealth v. Myers*, 290 Pa. 573, 139 A. 374 (1927). The effect of such remarks depends upon the atmosphere of the trial, *Commonwealth v. Dickerson*, 406 Pa. 102, 110, 176 A.2d 421 (1962); *Commonwealth v. Del Giorno*, 303 Pa. 509, 519, 154 A. 786 (1931), and the proper action to be taken is within the discretion of the trial court. *Commonwealth v. Silvis*, 445 Pa. 235, 237, 284 A.2d 740 (1971); *Commonwealth v. Simon*, supra. Viewing the remarks complained of as inspired, at least in part, by the conduct of defense counsel, we conclude the trial court did not abuse its discretion in refusing to declare a mistrial.

Basic to this case was the question of credibility. Without the testimony of Eways and Bailey, particularly the latter, the Commonwealth's case against Stoltzfus failed. In recognition of this point, a large portion of defense counsel's closing argument was properly directed at the credibility of the Commonwealth witnesses. In re-

10. Section 5.8(b) provides:
 "It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence of the guilt of the defendant . . . . ."

ferring to Eways' testimony, defense counsel declared, "I say that's ridiculous" and "They are trying to insult your intelligence again." In referring to Bailey's testimony, defense counsel stated, "And I say to you he is lying" and "This guy [Bailey] has absolutely no concept as to the meaning of an oath." And, in conclusion defense counsel reiterated, "I honestly say to you that you cannot believe people like Bailey and Eways who have testified in the manner they have, who have told as many lies as they have. And that is all they are—lies."

It is apparent that the district attorney's attack upon the credibility of Stoltzfus was motivated by, and was commensurate with, the prior attacks upon the credibility of Eways and Bailey. That being the case, the complaint now made as to the district attorney's summation has little merit. Cf. *Commonwealth v. Dickerson*, supra; *Commonwealth v. McHugh*, supra.

[23] It is next urged the charge to the jury was more favorable to the Commonwealth than to the accused because the trial court failed to refer, in any detail, to the cross-examination of Eways and Bailey when summarizing their testimony, whereas it did comment extensively upon the cross-examination of Stoltzfus.[11]

Reading the charge to the jury as a whole, as we must, *Commonwealth v. Stafford*, 451 Pa. 95, 98, 301 A.2d 600 (1973); *Commonwealth v. Zapata*, 447 Pa. 322, 328, 290 A.2d 114 (1972), we are convinced it was fair and that the jury was fully apprised of the weight to be given the testimony of each witness. The trial court carefully reviewed the testimony of each witness, with particular reference to Eways and Bailey, and discussed

11. Stoltzfus also argues that the trial court erred in redefining the degrees of murder near the end of its charge, as this could be taken by the jury as an indication that the trial court believed some finding of guilt was warranted by the evidence. However, considering the complexity of the case and the lengthy charge to the jury, it was certainly appropriate that there be a review of these definitions for the benefit of the jury.

the matter of credibility of witnesses as affected by contradictions in a witness' testimony, prior inconsistent statements and interest in the outcome of the case. In addition, the trial court properly gave cautionary instructions as to accepting the testimony of Eways and Bailey as accomplices. See *Commonwealth v. Banks*, supra; *Commonwealth v. Sisak*, 436 Pa. 262, 259 A.2d 428 (1969).

It is also contended the trial court erred in refusing two submitted points for charge. The points requested: (1) that the jury be instructed to consider the flight of Eways after the homicide [12] as evidence of "consciousness of guilt", affecting his credibility; and (2) that the jury be instructed that "if they determined that promises had been made to either Eways and/or Bailey, they could determine whether or not those promises have an effect on their credibility." We find no merit in this complaint. As stated previously, the jury was fully apprised of the weight to be given the testimony of each witness with full instructions as to those factors which would affect credibility.

Stoltzfus next contends the trial court erred in not granting his motion for mistrial resulting from the misconduct of a selected juror during the jury selection process. The facts are these:

John L. Maurer was selected as the second juror on September 22, 1970. On September 25th, after seven jurors had been selected, the trial court learned that Maur-

12. Two days after Eways had given a statement to the district attorney's office, on October 24, 1969, he left Pennsylvania and remained away until December 1969, when he turned himself in to the F.B.I. in Houston, Texas. Eways testified, over objection, that before leaving he had notified the Pagans [a gang of which Stoltzfus was a member] that he had given a statement to the district attorney. Appellant contends this testimony permitted the jury to infer that Eways left Pennsylvania because of a fear of the Pagans [and, necessarily, Stoltzfus]. Subsequently, the trial court instructed the jury to disregard this testimony of Eways. We believe this remedial instruction rectified any error. *Commonwealth v. Murray*, supra.

er had received two letters from his wife. Maurer was then questioned by the trial judge, defense counsel and the district attorney in the absence of the other selected jurors and the other members of the jury panel. He testified that he was a newlywed of two months and that the letters concerned personal matters involving the payment of bills, rather than information relating to the trial. The court tipstaff in charge of the selected jurors testified that while the selected jurors were passing through the lobby of the hotel in which they were lodged, Maurer stepped aside from the other jurors and attempted to kiss his wife who was standing nearby. The tipstaff further testified that Mrs. Maurer "tore away from him in the lobby of the hotel". Defense counsel then objected to proceeding with those jurors who had already been selected because they "might have drawn the . . . conclusion . . . that his wife was fearful because he was on the jury". The objection was overruled and subsequent motion for a mistrial was denied.[13]

The excusal of jurors for cause is a matter within the discretion of the trial court. *Commonwealth v. Jennings*, 446 Pa. 294, 301, 285 A.2d 143 (1971); *Commonwealth v. Pasco*, 332 Pa. 439, 445, 2 A.2d 736 (1938). In *Commonwealth v. Jennings*, supra, after some jurors had been selected, but before the jury was empaneled, one of the jurors left the hotel in which he was sequestered and telephoned his daughter. Counsel for the defendant moved for a mistrial. The trial judge then interviewed each of the selected jurors and was informed that none had any conversation with the juror who had broken security. The court then excused this juror for cause, directed that another juror be selected from the panel and overruled the motion for a mistrial. We ruled "[a]ssuming the action of the court was in derogation of Rule 1111 of the Pennsylvania Rules of

13. Maurer was excused from jury duty on grounds of hardship.

Criminal Procedure, 19 P.S. Appendix,[14] the error was clearly harmless". *Commonwealth v. Jennings,* supra, 446 Pa. at 301, 285 A.2d at 147.

Similar reasoning obtains presently. The trial court, after being informed of Maurer's contact with his wife, inquired of each of the other six selected jurors whether there was any conversation with Maurer concerning the contacts with his wife or whether any of them had overheard any communication between Maurer and his wife. Each juror responded that he had had no conversation whatsoever with Maurer concerning the letters from his wife or the incident in the hotel lobby. Defense counsel stated to the trial court that he was satisfied with the questions asked of the selected jurors. Moreover, the trial court instructed the jury that Maurer was excused from further service on the jury because of the problem of hardship and that his excusal had no relation to the merits of the case or to the guilt or innocence of Stoltzfus. Under these circumstances, we believe the motion for a mistrial was properly denied. Cf. *Commonwealth v. Dukes,* 460 Pa. 180, 331 A.2d 478 (1975).[15]

14. Rule 1111 of the Pennsylvania Rules of Criminal Procedure now provides:
 "(b) When sequestration is ordered, each juror, including any alternate, shall be sequestered from the time of acceptance as a juror until discharged."

15. In *Commonwealth v. Stewart,* 449 Pa. 50, 295 A.2d 303 (1972), the father of the victim of the murder had been on the panel of veniremen from which the trial jury had been drawn. Although no actual prejudice was shown, we ruled therein, "the possibility still remains that some incident occurred during their association on the jury panel with the victim's father, which was so inherently prejudicial that it rendered impartiality impossible." *Commonwealth v. Stewart,* supra at 57–58, 295 A.2d at 307. However, the trial court had denied Stewart's motion to withdraw a juror "without a hearing or an inquiry of the jurors selected to try the case, as to whether any of them had any type of conversation or association with [the father] . . . before being accepted as jurors in the case". *Commonwealth v. Stewart,* supra at 52, 295 A.2d at 304. The inquiry conducted by the trial court in the instant case distinguishes it from *Commonwealth v. Stewart,* supra.

██ Stoltzfus next contends the trial court erred in refusing to admit into evidence pictures of Eways and Bailey, taken August 13, 1969, showing them with beards and long hair. It is asserted these pictures should have been admitted for the purpose of "evaluating the credibility of Eways and Bailey, since they both looked like 'college professors' when they testified in court".

We have ruled that the admission of photographs is a matter largely within the discretion of the trial court. *Tolbert v. Gillette*, 438 Pa. 63, 66, 260 A.2d 463 (1970); *Semet v. Andorra Nurseries, Inc.*, 421 Pa. 484, 488–489, 219 A.2d 357 (1966). Instantly, defense counsel was permitted to question Eways and Bailey as to their appearance on August 13th. Eways testified that he had a beard that "came down along the jawline" and that he had not had a haircut for "a couple months". Bailey testified that he had a "full beard" and that he hadn't had a haircut in "[a]bout eight months". Since evidence of the appearance of Eways and Bailey on August 13, 1969, was before the jury in the form of their own testimony, it was clear that there was no need to duplicate such evidence by placing it before the jury in the form of photographs. The ruling of the trial court was well within the prerogative "to reject a picture on the ground that the evidence is cumulative or that the photograph is unnecessary". *Adamczuk v. Holloway*, 338 Pa. 263, 266, 13 A.2d 2, 4 (1940). See also *Commonwealth v. George*, 178 Pa.Super. 261, 116 A.2d 253 (1955).

██ Stoltzfus finally contends his due process rights were violated because the transcript of the trial held in September 1970 was not lodged in the clerk's office until November 8, 1972. We are unable to find that any harm resulted from the delay, a delay occasioned by the lengthy record and by the limited number of court stenographers available.

Judgment affirmed.

JONES, C. J., and NIX, J., concur in the result.